**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TIRA NEAL, | : | CIVIL ACTION NO. |
| Plaintiff, | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| NATIONAL HEALTH CARE ASSOCIATES, INC. D/B/A THE HEBREW CENTER FOR HEALTH | : | |
| | : | APRIL 8, 2021 |
| Defendant. | : | |

**COMPLAINT**

**JURISDICTION AND VENUE**

1. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2; and Connecticut State Law.

2. The jurisdiction of this court is founded upon 28 U.S.C. §1331 (federal question) and the provisions of 28 U.S.C. §1343.

3. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §1391(b) in that the claims arose in this district and Plaintiff resides in this district.

4. Supplemental jurisdiction over Plaintiff's supplemental state law claims are invoked pursuant to 28 U.S.C. §1367 as the claims arise out of the same transaction and occurrences as Plaintiff's federal claims.

5. Costs, expert witness fees, and attorney's fees are sought pursuant to 42 U.S.C. §1988.

## PLAINTIFF

6. The Plaintiff, Tira Neal ("Plaintiff" or "Neal") is a natural person and resident of the State of Connecticut.

## DEFENDANT

7. The Defendant, National Healthcare Associates, Inc. ("Defendant" or "NHCA"), is incorporated in the State of Connecticut, is registered to conduct business in the State of Connecticut, and conducts substantial business within the State of Connecticut at 850 Silas Deane Hwy, Wethersfield, CT 06109.

8. NHCA has rehabilitation and skilled nursing centers throughout the State of Connecticut and owns and/or manages The Hebrew Center for Health and Rehabilitation, located at 1 Abrahms Blvd, West Hartford, CT 06117, where the Plaintiff was employed.

9. Defendant employs more than twenty (20) employees.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Plaintiff received a Notice of Right to Sue on January 12, 2021, and timely files this action.

## FACTUAL ALLEGATIONS

11. NHCA hired Neal, an African-American, on September 25, 2019, for the position of Human Resources Manager.

12. Neal performed the duties of her position in a satisfactory manner.

13. Despite her performance, Neal was consistently subjected to outward harassment, hostility, disparate treatment, and retaliation, by Penni Martin, ("Martin") (Caucasian)

Facility Administrator, which entailed intimidation, intolerable humiliation, and overt unfair criticism.

14. This continuous pervasive harassment spanned from about January 24, 2020, through March 18, 2020, in retaliation for Neal raising good-faith concerns regarding Defendant's unscrupulous conduct.

15. Specifically, on or about January 24, 2020, Neal conducted an exit interview with an employee.

16. During the exit interview, the employee stated that her resignation was due to the fraudulent behaviors that she witnessed among the members of the leadership team.

17. The employee was extremely concerned because she was aware that a high-ranking management level employee falsified documents that pertained to the patients' care, and she observed another high-ranking manager, composing a fraudulent review of the facility designed to enhance the facility's image in the community because the overall ratings were significantly low.

**A. Neal Raised Her Good Faith Concerns Pursuant to Her Rights Under C.G.S. § 31-51q; In Response, Neal was Retaliated Against.[1]**

---

[1] The rights protected by Connecticut General Statute section 31-51q relate to "the exercise by [an] employee of rights guaranteed by the first amendment to the United States Constitution or section ... 4 ... of article first of the Constitution of the state [of Connecticut]." Conn. Gen. Stat. § 31-51q.

Even if Defendant argues that it was within his job description to raise these issues and that he was not legitimately raising issues of "public concern" — which we vehemently disagree — this outdated and narrow argument has not been followed since 2015, when the Connecticut Supreme Court expanded whistleblower protections in the landmark case of Trusz v. UBS REALTY INVESTORS, LLC, 123 A.3d 1212, 319 Conn. 175 (2015).

The certified question that the Supreme Court had to answer was: " 'Does the rule announced by the [United States] Supreme Court in Garcetti v. Ceballos, 547 U.S. 410, [421, 126 S.Ct. 1951, 164 L.Ed.2d 689] (2006), i.e., `that when... employees make statements pursuant to their official duties, the employees are not speaking

### a. Neal's First Complaint Against Her Supervisor Martin.

as citizens for [f]irst [a]mendment purposes, and the [c]onstitution does not insulate their communications from employer discipline,' apply to a claim that an employer violated [General Statutes] § 31-51q[1] by subjecting an employee `to discipline or discharge on account of the exercise by such employee of rights guaranteed by ... [§§] 3, 4 or 14 of article first 1214*1214 of the [c]onstitution of the state....?" (Footnote added.) We conclude that the answer to this question is 'no.' " (emphasis added) Id. at 1213.

Specifically, the Court concluded "that, under the state constitution, employee speech pursuant to official job duties on certain matters of significant public interest is protected from employer discipline in a public workplace, and § 31-51q extends the same protection to employee speech pursuant to official job duties in the private workplace." Id. at 1214.

In Trusz, "the plaintiff, Richard Trusz, was the head of UBS Realty's valuation unit and a [m]anaging [d]irector of UBS Realty. As head of the valuation unit, [the plaintiff] managed the process which ultimately resulted in the valuation of properties held in UBS Realty's private real estate investment funds. In early 2008 [the plaintiff] reported to UBS Realty management what he contended were errors in the valuation of certain properties held by UBS Realty in various investment funds. At that time [the plaintiff] also expressed to UBS Realty management his opinions that UBS Realty was obligated to correct and disclose to investors the valuation errors, … that the valuation unit had insufficient staff and resources to adequately perform its function, that UBS Realty's internal controls regarding valuation were inadequate, that UBS Realty improperly provided preferential treatment to certain investors…. " Id.

The Trusz defendants filed a brief "contending that § 31-51q did not apply because the plaintiff's workplace speech did not relate to matters of public concern and, therefore, was not constitutionally protected…." Id. at 1216.

The text of article first, § 4, of the Connecticut constitution "providing that citizens of this state are free to speak 'on all subjects, being responsible for the abuse of that liberty'; (emphasis added); is particularly relevant in the present case. This broad and encompassing language supports the conclusion that the state constitution protects employee speech in the public workplace on the widest possible range of topics, as long as the speech does not undermine the employer's legitimate interest in maintaining discipline, harmony and efficiency in the workplace." Id. at 1221.

The Trusz court held, that an employee's comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing … can weigh out in an employee's favor" when employee is speaking pursuant to official duties).   The Court further held that "speech in a public workplace [applies] under the state constitution and … § 31-51q extends the same protection to employee speech in a private workplace…." (emphasis added) Id. at 1235.

Thus, "even when an employee speaks pursuant to her official duties, the employee's speech will be protected so long as it is a "comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety...." Brown v. Office of State Comptroller, 211 F.Supp.3d 455 (D. Conn. 2016).

18. After the exit interview, Neal immediately raised her concerns to LaTonya Kupper ("Kupper"), Regional Human Resources Manager.

19. Neal raised issues of serious concern and complained of her supervisor Martin's unscrupulous conduct and leadership skills.

20. Kupper told Neal that the information she provided was troubling. Kupper warned Neal that if she continued to voice her concerns about the work environment, Martin would know that the information was coming from her and she would try to get her terminated.

21. Kupper further warned Neal that Martin is "a beast," (meaning very aggressive) when she wants someone off of her team.

22. Kupper encouraged Neal to speak with her colleague Florence Johnson ("Johnson") about her concerns so that Johnson could speak to Michelle Ronquillo ("Ronquillo") (Caucasian), Chief Human Resources Officer.

23. Shortly after Neal voiced her good-faith concerns about Martin's conduct, she was immediately subjected to several retaliatory acts.

24. As Martin's first salvo, she began humiliating Neal during meetings with her colleagues, undermining Neal's ability as a leader.

25. For example, on or about February 28, 2020, Neal attended a meeting with Martin and Ronquillo, Chief Human Resources Manager, to discuss several key issues at the facility. During the meeting, Martin consistently interrupted Neal and talked over her in a loud boisterous manner.

26. One of the improper issues discussed at the meeting was the meeting that occurred between Lovan Collins, the Union Representative from 1199, and the idea of

purposely hiring a change agent to persuade the nurses to refrain from joining the union—interfering with an employee's ability to make a free choice in union representation.

27. After the meeting, Neal received a telephone call from Kupper advising her that she received a telephone call from Ronquillo, the Chief HR Manager.

28. Kupper conveyed that during their conversation, Ronquillo stated to her: "I am concerned with how [Martin] is treating [Neal]." Ronquillo further stated to Kupper, "you told me about [Martin's] behavior towards Neal and now I see it. [Neal] looks defeated, and [Martin] kept talking over [Neal] and cutting her off."

29. Ronquillo further stated that she was afraid that Neal would resign as a result of being subjected to Martin's behavior.

30. At the conclusion of Neal's conversation with Kupper, she stated that Ronquillo, the Chief HR Manager, was purported "very aware of what [was] going on with [Martin] and [Neal]. Yet, nothing was done to deter Martin's unrelenting attack on Neal.

31. As a further act of animus, on March 6, 2020, Neal was in the process of completing an investigation that pertained to workplace bullying, and as she was escorting one of the employees out of her office, Martin was walking towards them to go to the water fountain, and as she passed by, she rolled her eyes at Neal in loathe.

   b. **Neal's Second Complaint Against Martin.**

32. Neal advised Kupper of Martin's inappropriate behavior again and Neal also advised her of how her investigation was proceeding with the employees.

33. On March 9, 2020, Martin contacted Neal and told her that she spoke with Kupper, and Martin instructed Neal to "**stop contacting Kupper**"—the Regional HR

-6-

Manager— "and speaking to her about issues that pertain to the facility"— substantially interfering with Neal's rights as an employee to seek protection from harassment and bullying.

34. Martin then pointedly told Neal, "you work for me, not National and not LaTonya [Kupper]," as a further threat to deter Neal from going above her and raising issues of concern to upper management within the company.

**B. After Neal's Conversation with Martin, Her Intimidation Tactics Intensified in Furtherance of Her Effort to Force Neal to Resign or Get Her Terminated.**

35. During the week of March 9, 2020, Martin subjected Neal to a series of unfavorable behaviors.

36. In point of fact, on March 12, 2020, Neal composed an offer letter for an employee that was in the process of transferring to Defendant's facility from another location.

37. Once the letter was composed, Neal provided the letter to Martin for review, per company procedure.

38. When Neal arrived in Martin's office, Neal extended her arm to hand Martin the letter, and Martin quickly snatched the letter from her hand and remarked, "what is this, don't we have a generic offer letter?" Martin then shoved the letter back at Neal.

    c. **Neal's Third Complaint Against Martin.**

39. Neal—despite Martin's threats not to—immediately contacted Kupper and complained of Martin's latest salvo.

40. Then again, on March 18, 2020, Martin began to impose drastic, intolerable, and unworkable changes to Neal's work schedule.

41. Martin emailed Neal instructing her to select two days to arrive at 6 a.m. to screen employees for the coronavirus, which would be impossible because Neal had a young child at home who was not in school.

   **d. Neal's <u>Fourth</u> Complaint Against Martin.**

42. Neal contacted Kupper and advised her of Martin's e-mail and stated that Martin is truly becoming hostile with her communications.

43. In addition to Martin sending an e-mail to Neal modifying her work schedule, Martin began to blame Neal for hiring per diem new graduates when it was <u>not</u> Neal's decision.

44. Neal complained to Kupper that Martin removed her from the hiring equation when the new Director of Nursing arrived, but yet, was blaming her for the hiring. The Director of Nursing had been making the hiring decisions and Kupper agreed that the Director of Nursing should be making the hiring decisions, not Neal. Neal stated that she would discuss the hiring decisions and schedule with Martin directly, and Kupper told Neal to follow up with her after that discussion occurred.

45. In the follow-up hiring and scheduling conversation, Neal informed Martin that due to the recent school closings and lack of sufficient childcare at home, she could not commit to a 6 a.m. start time (Neal's work hours were normally from 8 a.m. to 4:30 p.m., Monday -Friday).

46. Neal explained that if she was required to arrive at 6 a.m., she would have to leave her daughter at home alone, and she could not do that.

47. Martin became visibly upset and exclaimed, "so what! everyone else does, Doreen (Executive Assistant) works seven days a week and you can do more to help us during this time."

48. Neal also reminded Martin that, per her direction, the hiring decisions were made by the Director of Nursing. In response, Martin became loud, aggressive, and boisterous about why new hires should not be offered jobs and stated to Neal, "I am providing you feedback," to which Neal replied, "you are treating me hostile."

   e. **Neal's <u>Fifth</u> Complaint Against Martin.**

49. Shortly after Martin's outburst, Neal contacted Kupper again to complain of Martin's unchecked non-stop harassment.

50. Kupper superficially expressed her sentiments and stated that it was not her intention to subject Neal to that type of behavior when she hired her—an admission to the hostile work environment that Martin had created.

51. Kupper also could not guarantee that Martin's conduct would cease.

52. Kupper said that she would have Ronquillo contact Neal on March 18, 2020, at 12:30 p.m., and she may ask Marvin Ostreicher (the business owner), to join the conference call as he would like to know how one of his managers has been treated; however, Neal did not receive a telephone call at the promised scheduled time, and therefore, knowing she was not going to receive the required help and intervention from management, Neal gave her two weeks' notice that afternoon.

53. That evening Neal could not sleep or eat. So, the next day Neal constructively discharged <u>effectively immediately</u> on <u>March 19, 2020,</u> at 8:31 a.m.—without working the two-week notice period— due to the relentless non-stop constant harassment at the hands of Martin and lack of effort by Defendant to remedy the situation.

54. Finally, <u>after constructively discharging</u>, Neal received the overdue promised phone call from Ronquillo on March 19, at 5:00 p.m. By this time, Neal had already discharged.

55. During Neal's phone call with Ronquillo, Ronquillo asked her to walk her through the events that occurred with Martin.

56. Ronquillo stated that she "was aware" that there was a strain on the relationship between Neal and Martin.

57. Neal stated that Martin is a liability to the company and her behavior does not align with employment laws nor does her behavior align with the company's policies and procedures.

58. Ronquillo stated that they have been trying to encourage Martin to take a step back from her work responsibilities; however, they have been unsuccessful.

59. Neal explained that she was the only one subjected to Martin's undesirable behaviors.

60. During Neal's tenure, she did not witness any of her colleagues that are of a different ethnicity being subjected to adverse behaviors.

   **f. Caucasian Colleagues Often Received Preferential Treatment.**

61. For example, Kimberly Benson ("Benson"), a Caucasian nurse, had difficulties maintaining her work schedule too due to family issues. Benson was either absent or left work unexpectedly without notifying anyone. At one point, Martin could not contact Benson, and asked Martin to perform a "welfare check."

62. In addition, the former Assistant Director of Nursing Mara Romanaia ("Romanaia") (Caucasian) was experiencing difficulties with her work schedule due to attending to

family issues. Romanaia was provided with an opportunity to transition into a new role of staff development to accommodate her schedule.

## COUNT ONE

### RETALIATION,
### IN VIOLATION OF CONN. GEN. STAT. § 31-51q

63. Plaintiff incorporates paragraphs 1-62, with the same force and impact, as if fully set forth herein at length.

64. Neal was exercising her free speech on matters of public concern by reporting fraudulent activity within the company, her immediate supervisor, and issues of workplace bullying and intimidation.

65. Plaintiff's decision to report concerns regarding fraud, falsification of documents and bullying, were protected activities, provided for and compelled by the state of Connecticut.

66. The prevention of fraud and safety issues have been deemed an important public policy by Connecticut State Courts.

67. The complaints Plaintiff made are consistent with the desire to adhere to workplace standards and guidelines, and constitute protected activity.

68. In retaliation for her good-faith complaints and raising awareness to concerns, Neal was retaliated against by Martin, including, but not limited to the following:

    a) Bullying and intimidating her in violation of company policy; and

    b) Forcing her to constructively discharge on March 19, 2020.

69. Neal's speech is protected by Sections, 3, 4, and 14 of the Connecticut Constitution.

70. The exercise of her rights did not materially interfere with her job performance, nor

did it interfere with her job performance or working relationship with Defendant.

71. Plaintiff was discharged due to the exercise of her rights guaranteed by the Connecticut Constitution, in violation of Conn. Gen. Stat. § 31-51q.

72. As a result of her discharge, Neal has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

73. Neal seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT TWO

### WRONGFUL DISCHARGE IN VIOLATION OF AN IMPORTANT PUBLIC POLICY

74. Plaintiff incorporates paragraphs 1-73, with the same force and impact, as if fully set forth herein at length.

75. Neal's discharge, as set forth above, violated important public policies in the State of Connecticut, including, but not limited to, public policies concerning reporting issues of fraud, falsification of documents, and bullying.

76. The prevention of fraud and safety has been deemed an important public policy by Connecticut State Courts.

77. As a result of her discharge, Neal has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

78. Neal seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT THREE

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(AFRICAN-AMERICAN RACE)**

79. Plaintiff hereby incorporates Paragraphs 1-62 with the same force and impact as if fully set forth herein.

80. Defendant employs more than fifteen employees.

81. Plaintiff was qualified for her position.

82. Plaintiff, an African-American, is in a protected class.

83. Plaintiff was subjected to outward harassment and disparate treatment, at the hands of her supervisor Martin who bullied and intimidated her, causing her to be undermined and humiliated, and treated her in a hostile manner.

84. The Plaintiff suffered numerous adverse employment actions, including, but not limited to, the following:

   a) Bullying and intimidating her in violation of company policy; and

   b) Forcing her to constructively discharge on March 19, 2020.

85. The above prescribed discriminatory actions were taken against the Plaintiff because she is African-American.

86. Defendant's conduct is unlawful and in violation of Title VII.

87. As a result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer damages, including but not limited, to substantial lost wages, fringe benefits, health insurance, retirement and pension benefits, mental and emotional distress, and the ability to enjoy life's pleasures.

88. Plaintiff seeks damages as a result of Defendant's unlawful conduct.

**COUNT FOUR**

**VIOLATION OF TITLE VII**
**(HOSTILE WORK ENVIRONMENT BASED UPON RACE)**

89. Plaintiff incorporates paragraphs 1-62, with the same force and impact, as if fully set forth herein at length.

90. The Plaintiff, an African-American, is a member of a protected class.

91. The Plaintiff was at all times qualified for the position she held.

92. Defendant and Martin's conduct created a hostile work environment, which was objectively severe and pervasive in numerous ways, including, but not limited to:

   a) Humiliating Neal during meetings with her colleagues, undermining Neal's ability as a leader.

   b) Consistently interrupting Neal, and talking over her in a loud boisterous manner.

   c) Purposely hiring a change agent to persuade the nurses to refrain from joining the union—interfering with an employee's ability to make a free choice in union representation.

   d) Rolling her eyes at Neal in loathe.

   e) Instructing Neal to stop contacting Kupper—the Regional HR Manager— and speaking to her about issues that pertain to the facility—substantially interfering with Neal's rights as an employee to seek protection from harassment and bullying.

   f) Waning Neal, "you work for me, not National and not LaTonya [Kupper]," as a further threat to deter Neal from going above her and raising issues of concern to upper management within the company.

    g) Aggressively snatching a letter from Neal's hand.

    h) Imposing drastic and intolerable changes to Neal's work schedule.

    i) Removing Neal from the hiring process.

93. Martin's discriminatory harassment was offensive, demeaning, insulting, and outrageous, creating a hostile work environment to which the Plaintiff was repeatedly subjected.

94. The Plaintiff was subjected to hostility, which Plaintiff did not welcome, and Defendant did not prevent the outrageous conduct and behavior of its employee.

95. The Plaintiff was embarrassed, humiliated, disturbed, disgusted, intimidated, outraged, and offended by the conduct of Martin which negatively affected the conditions of her employment.

96. The Plaintiff suffered adverse employment actions as a result of the discriminatory conduct of Defendant when she was constructively discharged on March 19, 2020.

97. The conduct of Defendant subjected Plaintiff to a hostile work environment.

98. The Defendant violated Title VII of the Civil Rights Act by creating and maintaining a hostile work environment.

99. As a result of the foregoing unlawful conduct, the Plaintiff suffered and will continue to suffer damages, including but not limited to economic damages, emotional and psychological stress, distress, anxiety, and the inability to enjoy life's pleasures.

100. Plaintiff seeks damages as a result of Defendant's unlawful conduct.

THE MCMINN EMPLOYMENT LAW FIRM, LLC

## COUNT FIVE

## NEGLIGENT SUPERVISION

101. Plaintiff hereby incorporates Paragraphs 1-62 with the same force and impact as if set forth in full herein.

102. NHCA is responsible for any negligence or misconduct of its employees, in the workplace.

103. Martin engaged in a pattern of harassing behavior towards the Plaintiff that occurred regularly, including, but not limited to:

   a) Humiliating Neal during meetings with her colleagues, undermining Neal's ability as a leader.

   b) Consistently interrupting Neal, and talking over her in a loud boisterous manner.

   c) Purposely hiring a change agent to persuade the nurses to refrain from joining the union—interfering with an employee's ability to make a free choice in union representation.

   d) Rolling her eyes at Neal in loathe.

   e) Instructing Neal to stop contacting Kupper—the Regional HR Manager— and speaking to her about issues that pertain to the facility— substantially interfering with Neal's rights as an employee to seek protection from harassment and bullying.

   f) Waning Neal, "you work for me, not National and not LaTonya [Kupper]," as a further threat to deter Neal from going above her and raising issues of concern to upper management within the company.

   g) Aggressively snatching a letter from Neal's hand.

    h) Imposing drastic and intolerable changes to Neal's work schedule.

    i) Removing Neal from the hiring process.

104. Unable to further tolerate Martin's hostile, abusive, and disparate treatment towards Plaintiff, complained to upper management on at least <u>five</u> separate occasions about the harassment and retaliation by Martin.

105. Defendant was aware of Martin's conduct and failed to remedy the situation.

104. Kupper warned Neal that if she continued to voice her concerns about the work environment, Martin would know that the information was coming from her and she would try to get her terminated.

105. Ronquillo stated to Kupper: "I am concerned with how [Martin] is treating [Neal]." Ronquillo further stated to Kupper, "you told me about [Martin's] behavior towards Neal and now I see it. [Neal] looks defeated, and [Martin] kept talking over [Neal] and cutting her off."

106. Ronquillo further stated that she was afraid that Neal would resign as a result of being subjected to Martin's behavior.

107. On another occasion, Kupper stated to Neal that Ronquillo, the Chief HR Manager, was purported "very aware of what [was] going on with [Martin] and [Neal]. Yet, nothing was done to deter Martin's unrelenting attack on Neal.

108. Kupper superficially expressed her sentiments and stated that it was not her intention to subject Neal to that type of behavior when she hired her—an admission to the hostile work environment that Martin had created.

109. Ronquillo admitted that she "was aware" that there was a strain on the relationship between Neal and Martin.

100. Due to the Defendant's lack of action, Plaintiff was forced to continue to be subjected to a hostile and harassing work environment as a result of Defendant's negligent supervision of its employees.

101. As a result of the foregoing unlawful conduct, Plaintiff suffered and will continue to suffer damages including but not limited to economic damages and loss of benefits, emotional and psychological stress, distress, anxiety, and the ability to enjoy life's pleasures.

102. Plaintiff seeks damages as a result of Defendant's unlawful conduct.

**PRAYER FOR RELIEF**

Wherefore the Plaintiff prays that this court award:

1. Money damages;

2. Costs;

3. Punitive damages, attorney fees, and expert witness fees;

4. Pre-judgment interest

5. Trial by jury; and

6. Such other relief as the Court deems just, fair, and equitable.

            THE PLAINTIFF,
            TIRA NEAL


By: _____/s/_____
    Michael C. McMinn (*ct267169*)
    **THE MCMINN EMPLOYMENT LAW FIRM, LLC**
    1000 Lafayette Blvd., Suite 1100
    Bridgeport, CT 06604
    Tel: (203) 683-6007
    Fax: (203) 680-9881
    michael@mcminnemploymentlaw.com

    *COUNSEL FOR PLAINTIFF*